IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01797-MEH

TINA CHRISTINE LANE,

     Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Tina Lane appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83c.  Jurisdiction is proper under 42 U.S.C. § 405(g).  The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.  After consideration of the parties' briefs and the administrative record, the Court **affirms** the Commissioner's final order.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her application for DIB benefits filed on October 27, 2011, and for SSI benefits filed on November 1, 2011.

[Administrative Record ("AR") 119-32]    After the application was initially denied on February 9, 2012 [AR 43-44], an Administrative Law Judge ("ALJ") scheduled a hearing upon Plaintiff's request for November 14, 2012.    [AR 107]    Plaintiff and a vocational expert ("VE") testified at the hearing.    [AR 26-42]    The ALJ issued a written ruling on December 12, 2012, finding Plaintiff was not disabled, because there were jobs existing in significant numbers in the national economy that Plaintiff could perform in consideration of her age, education, work experience and residual functional capacity ("RFC").    [AR 11-20]    The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review.    [AR 1-6] *See* 20 C.F.R. § 416.1481.    Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on May 23, 1970; she was 41 years old when she filed her application for DIB on October 27, 2011, and for SSI on November 1, 2011.    [AR 143-52]    Plaintiff claims she became disabled on November 1, 2009 [AR 143] and consequently cannot work because of anxiety, depression, obesity, gastritis, and cervical degenerative disc disease.    [AR 147]    Plaintiff completed a "Personal Pain Questionnaire" in tandem with her application in which she claimed having "pain daily" throughout the week "when sitting, standing, walking, and resting."    [AR 165]    Plaintiff, when asked how the pain limits her activities, stated that she is "not able to do normal activities."    [*Id.*]    Plaintiff additionally completed a "Function Report" in which she described the conditions that limit her ability to work, including not being

able to lift anything over ten pounds, feeling pain in her upper spine and lower lumbar, and having an inability to walk or stand for more than 15 minutes at a time.   [AR 170]

Plaintiff's work history includes being a cashier at a recycling business from 1999-2001, a payroll clerk in 2001, a waitress at a night club from 2004-2009, and a nursing assistant from 2006-2009.   [AR 138, 153]

A.      Physical Conditions

Plaintiff claims to suffer from cervical degenerative disc disease, obesity, gastritis, and chronic obstructive pulmonary disease ("COPD").   The medical histories of these conditions follow.

In November 2010, Kali Mae Mendoza-Werner, PA-C, Plaintiff's primary care doctor, diagnosed Plaintiff with cervical degenerative disc disease because of a C6-7 diffused disk bulge [AR 211] revealed in an MRI two days prior [AR 214].   A year later, Plaintiff presented to Dr. Mendoza with neck and shoulder pain.   [AR 320]   Dr. Mendoza recommended physical therapy, referred Plaintiff to a neurosurgeon, and prescribed Percocet.   [AR 322]   Dr. Mendoza saw Plaintiff a month later and denied Plaintiff eligibility for the Colorado Aid to the Needy Disabled Program ("AND").   [AR 318]   Plaintiff did not comply with the doctor's order to do physical therapy.   [*Id.*]

Plaintiff switched primary care doctors a week later, on November 29, 2011, to James M. Satt, M.D.   [AR 254]   Dr. Satt ordered three tests: an MRI of Plaintiff's left shoulder, a nerve conduction, and an electromyographic examination.   [AR 255, 283]   The tests yielded normal results with no evidence of nerve entrapment or cervical radiculopathy.   [*Id.*]   However, Dr.

Satt completed a statement indicating that Plaintiff was disabled and unable to work because of "breathing problems, problems with left arm, [and] chronic pain in neck and left shoulder." [AR 286]   Plaintiff used this statement for eligibility for the Colorado AND program.   Dr. Satt prescribed Plaintiff Norco (10mg three times per day, as needed) for neck pain.   [AR 311] During a disability examination with Christopher M. Davis, D.O., on January 12, 2012, Plaintiff stated she had chronic neck pain and she was taking a "large dose of chronic narcotic pain medication."   [AR 272-77]   On March 6, 2012, the Arkansas Valley Regional Medical Center ("AVRMC") Rehabilitation Services reported Plaintiff presented for an evaluation for her neck pain but failed to return for subsequent appointments.   [AR 296]   Plaintiff then switched primary care physicians to Jason Morgenson, M.D., at Valley Wide Health Services ("VWHS") who changed her medication for neck pain to Gabapentin (300 mg twice per day) on June 27, 2012.   [AR 309-11]   When Plaintiff's pain continued despite the medication, Dr. Morgenson increased Gabapentin to 900 mg per day.   [AR 305-08]   He then switched Plaintiff's medication to Amitriptyline (25 mg per day) on September 5, 2012.   [AR 301-04]   Dr. Morgenson also referred Plaintiff to AVRMC to get another MRI of her cervical spine.   [AR 327]   The results came back unchanged from the previous MRI, dated October 29, 2010.   [*Id.*]

Regarding obesity and gastritis, Dr. Mendoza described Plaintiff as an "obese 40-year-old female in no acute distress" during a wellness exam on July 22, 2010.   [AR 237]   Dr. Mendoza informed Plaintiff of the impact her weight has on her overall health.   [AR 236] During this wellness exam, Plaintiff presented with nausea and discomfort, which Dr. Mendoza diagnosed as gastritis and prescribed Ranitidine (300 mg per day).   [*Id.*]   Dr. Mendoza also

recommended Plaintiff avoid trigger foods.   [*Id.*]   A year later, Dr. Mendoza changed the medication to Omeprazole (20 mg twice per day).   [AR 212]   During a disability exam, on January 12, 2012, Christopher M. Davis, D.O., reported Plaintiff had a documented history of gastritis, but her symptoms improved with Omeprazole.   [AR 272]

Finally, the medical history of the Plaintiff's COPD is conflicting.   COPD first appears in the record on July 22, 2010, with Dr. Mendoza reporting a history of COPD with Plaintiff's father.   [AR 237]   Dr. Mendoza listed Plaintiff's lungs as "clear to auscultation bilaterally." [*Id.*]   The following June, Dr. Mendoza recorded that Plaintiff smoked one pack of cigarettes a day for more than 28 years.   [AR 229]   That fall, Dr. Satt noted Plaintiff presented with a chronic cough and shortness of breath.   [AR 254]   Dr. Satt diagnosed Plaintiff with early stages of COPD, but two months later he noted no indication of COPD based on a chest x-ray at AVRMC.   [AR 326, 330]   On June 1, 2012, Dr. Morgenson, Plaintiff's new primary care physician, noted Plaintiff used oxygen at night for COPD.   [AR 312]   The doctor counseled Plaintiff to quit smoking.   [*Id.*]   A month later, Plaintiff presented with edema on her feet, which Dr. Morgenson attributed to Plaintiff's COPD.   [AR 312-14]

In addition to the above medical history, Dr. Satt filled out a RFC assessment for Plaintiff on March 1, 2012.   [AR 287-90]   During the three months Dr. Satt saw Plaintiff prior to filling out the RFC, he assessed her physical conditions to be cervical degenerative disc disease, gastroesophageal reflux disease (GERD), sleep apnea, and hyposomnia.   [*Id.*]   Dr. Satt commented that Plaintiff can sit for two hours at a time, walk for one hour, lift up to 20 pounds, and reach in a limited manner.   [*Id.*]

B.    Mental Conditions

Plaintiff claims a long history of anxiety and depression that is aggravated by everyday stress.   [AR 272]   On February 6, 2009, Dr. Mendoza increased Plaintiff's medication for Prozac to 40 mg from 20 mg per day.   [AR 244]   A year later, Dr. Mendoza continued Plaintiff on Prozac, noting the depression as "well-controlled."   [AR 239]   The record indicates Plaintiff's prescription for Prozac increased to 60 mg per day on or before June 3, 2011.   [AR 212]   At a visit on October 14, 2011, in a listing of "Chronic Problems," Dr. Mendoza listed Plaintiff's depression as major depressive disorder.   [AR 319]

Plaintiff met with Richard B. Madsen, Ph.D., for a psychological evaluation on January 18, 2012.   [AR 259]   In his report, Dr. Madsen listed Plaintiff's symptoms of depression as: irritability, hyposomnia, withdrawal, crying spells, anxiety, fatigue, sadness, decreased interest, difficulty concentrating, poor self-esteem, low tolerance for frustration, decreased libido, decreased motivation, and feelings of helplessness.   [AR 260]   Plaintiff stated during the evaluation that depression interferes with her work.   [*Id.*]   The doctor diagnosed Plaintiff with moderate major depressive disorder, chronic post-traumatic stress disorder, panic disorder and assessed a global access function ("GAF") score of 60.[1]   [*Id.*]   During her disability exam with

---

[1] In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91-100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."

Christopher M. Davis, D.O., on January 12, 2012, Plaintiff reported she has had anxiety and depression "for multiple years" that is caused by every day stress. [AR 272] Plaintiff stated that she had not been hospitalized for anxiety or depression, had not attempted suicide, and was not seeing a therapist or psychiatrist. [*Id.*]

---

- 81-90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
- 71-80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
- 61-70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
- 51-60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
- 41-50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
- 31-40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
- 21-30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
- 11-20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
- 1-10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
- 0: "Inadequate information."

The state psychological examiner, Dr. Sara Sexton, Psy.D., assessed Plaintiff's RFC a month later.   [AR 50-57]   Dr. Sexton described her ability to carry out detailed instructions, maintain concentration, work with others without being easily distracted, and carry out a normal workday as "moderately limited."   [AR 55-56]   She opined that depression and anxiety caused these limitations.   [*Id.*]   Dr. Sexton determined that Plaintiff could complete a normal workday with the following conditions: simple instructions, ordinary routines, simple decision making, limited interaction with the general public, and infrequent interaction from supervisors or co-workers.   [AR 56-57]   In contrast, Dr. Satt, in filling out an RFC, diagnosed Plaintiff with bipolar affective disorder.   [AR 290-94]   Dr. Satt determined Plaintiff had a marked inability to interact with the public, a moderate ability to interact with coworkers and supervisors, and a moderate ability to complete a normal workday.   [AR 293]

## III.    Hearing Testimony

On November 14, 2012, Plaintiff, her attorney, and VE Edward Stephen participated in the hearing testimony.   [AR 28-42]   Plaintiff testified that her spine, shoulder, and neck keep her from working.   [AR 29]   She stated that for purposes of work, she could lift "probably no more than 20 pounds."   [*Id.*]   Plaintiff said that the pain caused problems with standing and sitting.   [AR 30]   She testified that she could stand for "a half hour to an hour" before needing to sit down, but she could only sit for an hour because of the pain in her back.   [*Id.*]   Plaintiff also testified that depression affected her ability to work, causing her to be anxious around others.   [AR 31]   Plaintiff said that she was taking medication for the depression but was not seeing a counselor or therapist.   [*Id.*]   She also claimed to have trouble focusing and

8

concentrating on tasks, such as working on a puzzle.   [AR 32]

The VE testified that an individual with Plaintiff's age, experience and education could perform the jobs of security monitor, machine tender, or housekeeper.   [AR 38-39]   The VE incorporated several limitations in his determination of suitable jobs including: low-stress work; no pulmonary irritants such as dust, fumes, gases, chemicals, or light; no humidity or temperature extremes; and no repetitive movement of the neck.   [*Id.*]   With the added restrictions of no concentrated exposure to pulmonary irritants and low frequency of reaching, handling, and fingering, the VE eliminated the housekeeper position.   [AR 40-41]   Finally, the VE testified that an individual who works as a security monitor may need to look at multiple screens, but the whole body could be turned as opposed to the neck, which fit within Plaintiff's limitations.   [AR 41]

The ALJ issued an unfavorable decision on December 12, 2012.   [AR 8-25]

## LEGAL STANDARDS

### I.   SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.   If she is, disability benefits are denied.   *See* 20 C.F.R. §§ 404.1520, 416.920.   Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).   If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.   *See* 20 C.F.R. 404.1520(c).   Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   If the impairment is not listed, she is not presumed to be conclusively disabled.   Step Four then requires the claimant to show that her impairment(s) and assessed RFC prevent her from performing work that she has performed in the past.   If the claimant is able to perform her previous work, the claimant is not disabled.   *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).   Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.   *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.   *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287

F.3d 903, 905 (10th Cir. 2001).   Thus, the function of the Court's review is "to determine whether the findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom.   If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).   "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.   *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).   However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.   *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of her disability, November 1, 2009 (Step One).   [AR 13]   Further, the ALJ determined that Plaintiff had the following severe impairments: cervical degenerative disc disease, obesity, gastritis, COPD, anxiety, and depression (Step Two).   [*Id.*]   Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).   [AR 14-17]

The ALJ then determined that Plaintiff had the RFC to perform "light and sedentary work" except Plaintiff:

> cannot perform more than low stress work (simple, routine tasks; no interaction with the public; no exposure to unprotected heights or dangerous or moving machinery; and no work requiring high production of demands or offering only piece-rate pay); cannot be exposed to concentrated levels of pulmonary irritants such as fumes, odors, dusts, chemicals, or gases; cannot be exposed to temperature or humidity extremes; cannot be required to perform work requiring the claimant to repetitively move her neck up or down or side-to-side.

[AR 17]   The ALJ determined the record reflected Plaintiff's "medically determinable impairments which could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above functional capacity assessment."   [*Id.*]

The ALJ determined that Plaintiff was unable to perform any past relevant work (Step Four), and that considering Plaintiff's age, education, work experience and RFC, Plaintiff could perform jobs existing in significant numbers in the national economy.   [AR 19]   As a result, the ALJ concluded that Plaintiff was not disabled and, therefore, was not disabled as defined by the SSA (Step Five).   [AR 20]

Plaintiff sought review of the ALJ's decision by the Appeals Council on January 8, 2013. [AR 7]   On June 2, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."   [AR 1]   Plaintiff timely filed her Complaint in this matter on June 30, 2014.

12

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (I) the ALJ erred by failing to perform the two-step analysis when assessing the opinion of the treating physician; (II) the ALJ's RFC finding does not properly account for the moderate impairments he found at Step Three; (III) the ALJ improperly elevated the opinion of the nonexamining psychologist over that of the treating physician without a compelling reason; and (IV) the ALJ failed to account for all of the limitations in the opinion given great weight without a proper explanation.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

**I.      Whether the ALJ Failed to Perform the Two-Step Analysis when Assessing the Treating Physician's Opinion**

Plaintiff argues the ALJ erred in "rejecting Dr. Satt's treating physician opinion without performing the proper two-step analysis." Further, the ALJ's reasons for rejecting Dr. Satt's opinions are "reasons to deny controlling weight, but not reasons to completely reject the treating physician opinion."   *See* Plaintiff's Reply Brief, docket #21 at 2.

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct.   *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011).   The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates.   *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330.   To do so, the ALJ:

must first consider whether the opinion is well-supported by medically acceptable

13

> clinical and laboratory diagnostic techniques.   If the answer to this question is "no," then the inquiry at this stage is complete.   If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. . . [I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight.

*Watkins*, 350 F.3d at 1300 (citing Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *2 (1996)) (internal quotation marks and citations omitted); *accord Mays v. Colvin*, 739 F.3d 569, 574 (10th Cir. 2014); *see also* 20 C.F.R. § 416.927(d)(2).   If, however, a treating physician's opinion is not entitled to controlling weight, the ALJ must proceed to the next step, because "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."   *Watkins*, 350 F.3d at 1300; *see also Mays*, 739 F.3d at 574.

Secondly, "the ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned."   *Krauser*, 638 F.3d at 1330.   If this is not done, remand is mandatory.   *Id.*   As SSR 96-2p explains:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.   Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§] 404.1527 and 416.927.   In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* (citing SSR 96-2p, 1996 WL 374188, at *4 (1996)).   Hence, the absence of a condition for controlling weight raises, but does not resolve the second, distinct question of how much weight

14

to give the opinion.   *Krauser*, 638 F.3d at 1330-31 (citation omitted).    In weighing the opinion,

the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.* at 1331.   In applying these factors, "an ALJ must 'give good reasons in the notice of

determination or decision for the weight he ultimatel[y] assign[s].'"   *Watkins*, 350 F.3d at 1300

(quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p, 1996 WL 374188, at *5 (July 2,

1996); *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003).   "However, an ALJ need not

'apply expressly each of the six relevant factors in deciding what weight to give a medical

opinion,' so long as he provides 'good reasons in his decision.'"   *Thielemier v. Colvin*, No.

12-cv-03178-PAB, 2014 WL 1292885, at *3 (D. Colo. Mar. 31, 2014) (quoting *Oldham v.

Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)). Without these findings, remand is required.

*Watkins*, 350 F.3d at 1300-01; *accord Krauser*, 638 F.3d at 1330.    If the ALJ rejects the opinion

entirely, he must give "specific, legitimate reasons" for doing so.   *Watkins*, 350 F.3d at 1301.

The first prong of the two-step analysis is to determine whether the opinion has

controlling weight by "first consider[ing] whether the opinion is well-supported by medically

acceptable clinical and laboratory diagnostic techniques."   *Watkins*, 350 F.3d at 1300 (applying

SSR 96-2p, 1996 WL 374188, at *2 (1996)) (internal quotation marks omitted).   The ALJ

began his reasoning by stating that Dr. Satt's forms do not have sufficient information.   [AR 18]

The ALJ discounted Dr. Satt's diagnosis that Plaintiff is "permanently disabled," as an assessment of disability is reserved for the Commissioner and is "not a medical issue."   [*Id.*] *See* Social Security Act, § 205(g), as amended, 42 U.S.C.A. § 405(g) (treating physician's opinion that Social Security disability claimant is disabled is not dispositive, as final responsibility for determining disability is reserved to the Commissioner).   Furthermore, the ALJ pointed out that Dr. Satt completed out the RFC by relying upon Plaintiff's statements instead of her medical record, as he had only been seeing her for three months and did not know her entire medical history.   [*Id.*]   The ALJ concluded that Dr. Satt did not provide "sufficient explanation" to support his findings.   [AR 19]

As the ALJ is reviewing a treating physician's opinion for controlling weight, he must "confirm that the opinion is consistent with other substantial evidence in the record."   *Watkins*, 350 F.3d at 1300.   In his reasoning, the ALJ indicated an overall insufficiency in Dr. Satt's opinions:

> In March 2012, Dr. Satt diagnosed the claimant with degenerative disc disease of the cervical spine, gastrointestinal reflux disease, sleep apnea, and bipolar affective disorders.   Dr. Satt went on to indicate the claimant could stand and walk for two hours of an eight hour day with unlimited sitting, and limited postural activities and reaching.   Again, Dr. Satt provided this information on a form without sufficient information.   On yet another form without sufficient explanation, Dr. Satt diagnosed these impairments again, stated the claimant had moderate-to-marked social and concentration limitations since 2001 based on the claimant's self-reports.   Dr. Satt has only prescribed medication to the claimant since November 2011, has not provided sufficient explanation to support his divergent findings, relied upon the claimant's self-reports, and has not established his credentials to provide psychological in addition to physical assessments. Given the substantial divergence Dr. Satt's opinions have from the evidentiary record and other medical opinions and Dr. Satt's failure to adequately explain the basis for these opinions, the undersigned gave little weight to Dr. Satt's form statements.

16

[AR 18-19 (internal citations omitted)]   The Court finds that the ALJ's determination to deny the treating physician controlling weight is sufficient as Dr. Satt relied on Plaintiff's self-reports, which varied from the evidentiary record and other medical opinions, without sufficient explanation.

In the second prong of the two-step analysis, the ALJ must assess the treating physician's opinion to determine how much weight should be given in accordance with the factors listed *supra*.   *Watkins*, 350 F.3d at 1300.   The ALJ only gave "some weight" to Dr. Satt's opinion because: (1) he treated Plaintiff for just six months, from November 2011 to June 2012; (2) he did not provide sufficient information to support his contrary findings; (3) he relied upon Plaintiff's self-reports; and (4) he commented on areas outside his expertise but did not establish his credentials to do so.   [AR 18-19]   The ALJ concluded that Dr. Satt's opinion should be awarded some weight because of "the substantial divergence Dr. Satt's opinions have from the evidentiary record and other medical opinions."   [AR 19]   The Court will examine the ALJ's reasons in turn.

First, an ALJ may properly disregard a treating physician's functional assessment of a claimant where the treatment relationship was relatively brief.   *White*, 287 F.3d at 908; *see* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 381 (6th Cir. 2013) (holding that the little weight that the ALJ gave to an opinion of a psychological therapist was sufficiently supported, where the therapist's opinion relied on claimant's subjective claims rather than on detailed clinical data, and therapist saw claimant for only five months).   The ALJ noted Dr. Satt only saw Plaintiff between November 29, 2011 and

17

mid-June 2012.   Dr. Satt completed the RFC in March, three months after he began to treat Plaintiff.   [AR 287-94]

Second, the more a physician presents explanations and relevant evidence to support an opinion, the more weight the opinion is given.   *See* 20 C.F.R. § 404.1527(c)(3).   The ALJ repeatedly indicated the overall lack of sufficient information and explanation on Dr. Satt's forms.   [AR 18-19]   The ALJ also criticized Dr. Satt's overreliance on Plaintiff's statements, such as Dr. Satt stating Plaintiff's limitations began in 2001, a decade before he began treating Plaintiff.   [AR 19]

Third, while it is true that a physician may rely in part on a claimant's description of her own symptoms when coming to an opinion, *see* 20 C.F.R. subpart P, app. 1, § 12.00(B), the ALJ may give little weight to physicians' opinions that depend on the statements of a claimant when there is reason to question the claimant's credibility.   *See Oldham v. Astrue*, 509 F.3d 1254, 1257 (10th Cir. 2007) ("Based on the evidence indicating [claimant's] propensity to exaggerate her symptoms and manipulate test results, the ALJ refused to credit opinions of treating and examining medical providers that depended on [claimant's] veracity.").   Dr. Sexton remarked that Plaintiff's statements were only partially credible because "she appears to underestimate her functional abilities" and her claims are not fully supported by the evidentiary report.   [AR 52] The ALJ also commented on Plaintiff's credibility:

> [T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.   The claimant alleged that she cannot sit for any length of time, must soak in a tub ten times a day for pain relief, has poor balance, and cannot concentrate for more than ten minutes due to pain. Elsewhere, the claimant admits she can get in and out of a car, and the claimant

> demonstrated her ability to sit, pay attention, and respond appropriately to questions for approximately 45 [minutes] during the hearing.…The undersigned finds the objective and subjective evidence does not fully support the claimant's allegations.

[AR 17-18 (internal citations omitted)]

Finally, the ALJ indicated that Dr. Satt has not established his credentials to provide psychological in addition to physical assessments.   [AR 19]   Dr. Satt, as a family practitioner, can prescribe medicine to his clients – including for mental health issues.   However, under 20 C.F.R. § 404.1527(c)(5), Social Security "generally give[s] more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."   As such, Dr. Sexton and Dr. Madsen's opinions, as psychologists, have more controlling weight than Dr. Satt's opinions regarding Plaintiff's mental health.

The Court finds the ALJ's decision was "sufficiently specific to make clear to any subsequent reviewers the weight [he] gave to the treating source's medical opinion and the reasons for that weight."   *Watkins*, 350 F.3d at 1300 (citing SSR 96-2p).   The Court finds the ALJ assessed the treating physician's opinion under the two-step process, and therefore the ALJ did not err in assigning Dr. Satt's opinion "some weight."

## II.   Whether the ALJ Properly Included the Moderate Impairments at Step Three in the RFC Finding

Plaintiff argues the ALJ found that Plaintiff is moderately limited in the category of concentration, persistence or pace, but erred in his questioning of the VE by merely including this limitation as a reduction of the skill level of the work.   *See* Plaintiff's Opening Brief,

docket #17 at 20-23.   Defendant argues that an RFC that includes the medical records is an administrative assessment by the ALJ.   *See* Defendant's Response Brief, docket #20 at 17-19. Defendant additionally asserts that the ALJ carefully crafted an RFC finding that accommodates numerous limitations including the limitation of concentration, persistence or pace.   *Id.*

An RFC, as defined by the SSA, is an "administrative assessment of the extent to which an individual's medically determinable impairment(s)…may affect his or her capacity to do work-related physical and mental activities."   SSR 96-8p, 1996 WL 374184 at *2 (July 2, 1996).   It is assessed "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'"   *Id.*

"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   A restriction to "unskilled work" may but does not necessarily take into account a claimant's mental impairments.   *See Chapo v. Astrue*, 682 F.3d 1285, 1290 n.3 (10th Cir. 2012) (restriction to unskilled work accounted for issues of skill transfer and not impairment of mental functions); *Wayland v. Chater*, Nos. 95-7029, 95-7059, 1996 WL 50459 at *2 (10th Cir. Feb. 7, 1996) (unpublished) (recognizing that there may be circumstances in which a mental limitation can be accommodated by a reduction in skill level that no vocational evidence specifically addressing that limitation is necessary).

While the ALJ did find that Plaintiff had moderate limitations in maintaining concentration, persistence, and pace in analyzing the "paragraph B" criteria at Step Three [AR 16], it does not follow that the ALJ erred by not including this limitation in his questioning of the

VE or in Plaintiff's RFC.   As explained by the Social Security regulations,

> [t]he adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.   The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C…

*See* SSR 96-8p, 1996 WL 374184 at *4 (July 2, 1996).   Additionally, "[t]he RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."   *Id.* at *1.   "[N]umerous cases from this jurisdiction have held that an ALJ is not required to include paragraph B limitations in an assessment of the claimant's RFC or in hypothetical questioning of the VE unless it results in a functional limitation."   *Cassares v. Colvin*, No. 13-CV-01512-LTB, 2014 WL 4548616, at *4 (D. Colo. Sept. 15, 2014).

Here, the ALJ's assessment of Plaintiff's RFC included the functional limitations of low stress work as defined by simple, routine tasks, no interaction with the public, no exposure to unprotected heights or dangerous or moving machinery, no work requiring high production demands or only offering piece rate pay, no exposure to concentrated levels of pulmonary irritants, no humidity or temperature extremes, and no work that causes Plaintiff to repeatedly move her neck.   [AR 17]   The ALJ did not include the limitation of concentration, persistence, or pace during the questioning of the VE.   Plaintiff argues specific limitations should have been relayed to the VE instead of relying upon terms such as "low stress and unskilled."   *See* Plaintiff's Opening Brief, docket #17 at 20-23.   Plaintiff asserts that the "overly simplistic finding" of low stress, unskilled work does not elicit a proper VE testimony.   *Id.*

21

The ALJ marked the limitation of concentration, persistence, or pace as "moderate," which does not meet the paragraph B requirements to be considered a functional limitation, and therefore does not need to be included in the hypothetical questioning of the VE.   [AR 15] The ALJ designated her limitation as moderate because Plaintiff is able to partake in a variety of activities such as cleaning, driving, and self-care.   [AR 16]   Further, the ALJ stated that the Plaintiff's statements concerning the limitations are "not credible" as they are "inconsistent" with the RFC.   [AR 17]   It follows then that the ALJ would not ask the VE to include this limitation in the assessment of potential jobs, as the determination of paragraph B limitations being adopted into an RFC is an administrative decision.   The Court agrees with Defendant that the "ALJ bears the responsibility" to assess Plaintiff's RFC, and here, the ALJ carefully crafted an RFC finding that included numerous limitations that were "specifically tailored" to accommodate Plaintiff's limitations.   *See* Defendant's Brief, docket #18 at 17-19.   The Court therefore concludes that the ALJ did not err by not including limitations on concentration, persistence, and pace in Plaintiff's RFC or in his questioning of the VE.

### III.   Whether the ALJ Improperly Elevated the Psychologist's Opinion over the Treating Physician's Opinion

Plaintiff argues that the ALJ erred in elevating the opinion of the nonexamining physician, Dr. Sexton, over that of the treating doctor, Dr. Satt, without a compelling reason. *See* Plaintiff's Opening Brief, docket #17 at 23-32.   An ALJ cannot ignore a medical source's opinion; he must evaluate and consider it.   *See* 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").   The ALJ must give "good reasons" for the weight he or she ultimately assigns each medical opinion.   *Watkins*, 350 F.3d at

1301.   "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all."   *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

An ALJ must evaluate the nonexamining opinion using the same factors used to evaluate an examining opinion.   *See* 20 C.F.R. §§ 404.1527(d), (f)(2)(ii).   These include: the examining relationship; the length, frequency, nature, and extent of the treatment relationship; specialization; and other factors, such as the source's amount of understanding of the disability program.   *Id.* §§ 404.1527(d), (f)(2)(ii).   Then, unless a treating source's opinion is given controlling weight, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant."   *Id.* § 404.1527(f)(2)(ii).   So long as the ALJ provides good reasons (supported by substantial evidence) for the weight accorded to an opinion, such reasons should provide a reviewer with the ability to determine why one opinion is accorded more weight than another.   *See Reyes v. Bower*, 845 F.2d 242, 245 (10th Cir. 1988) (conclusory statements do not provide the justification legally required for rejecting a treating physician's opinion and accepting instead an examining physician's opinion).

The ALJ assigned "great weight" to the nonexamining psychological examiner's opinion, Dr. Sexton.   [AR 18]   On February 2, 2012, the nonexamining psychologist reviewed the evidence in support of Plaintiff's stated mental and physical disability and concluded Plaintiff suffered from a spine disorder, obesity, COPD, disorders of the gastrointestinal system, nonspecific affective disorder, and anxiety disorder.   [AR 51]   Dr. Sexton determined Plaintiff's statements of her symptoms "partially credible" based on Dr. Madsen's findings, and

concluded the Plaintiff's:

> symptoms may interfere with completion of a normal workday or workweek or may cause inconsistent pace. However, when work does not require more than simple instructions, ordinary routines and simple work decision making, limitations of attendance and pace will not prevent the completion of a normal workday/workweek or significantly reduce pace.

[AR 56]   The ALJ gave "the State examiner's opinion substantial weight, as this medical opinion is well-supported by the evidence, based on access to the claimant's medical history, and reflects the examiner's experience providing medical opinions."   [AR 18]   The Court will address each of the ALJ's reasons in turn.

First, the ALJ determined that the medical record supports Dr. Sexton's opinion.   [*Id.*] Plaintiff argues Dr. Sexton's opinion is not inconsistent with Dr. Satt's opinion.   *See* Plaintiff's Opening Brief, docket #17 at 25-29.   Plaintiff claims that the ALJ "erred in elevating Dr. Sexton's suspect opinion over that of the treating physician based on Plaintiff's daily activities." *Id.*   Defendant argues Dr. Sexton's opinion is consistent with the record while Dr. Satt's opinion is contrary to the record.   *See* Defendant's Response Brief, docket #20 at 15-16.

The Court's review of the record finds that Dr. Sexton's opinion was consistent as to the record as a whole, while Dr. Satt's findings were contrary to the record.   For example, Dr. Sexton noted that Plaintiff's depression improved with medication, which is supported by Dr. Mendoza's conclusion in March of 2010.   [AR 239]   Dr. Sexton's assessment of Plaintiff's depression and anxiety aligns with the conclusions of Dr. Madsen and Dr. Davis as those conditions affect her work and ability to be around others.   [AR 260, 272]   In contrast, Dr. Satt's opinion conflicted with the medical record.   Dr. Satt diagnosed Plaintiff with bipolar

affective disorder. [AR 288-290] Yet three doctors – Dr. Mendoza, Dr. Sexton and Dr. Madsen – all assigned Plaintiff with anxiety and depressive disorders, not bipolar affective disorder. [AR 319, 51, 260] Dr. Satt wrote that the physical impairments presented in 2009. [AR 290] Yet, Plaintiff's cervical degenerative disc disease was not discovered until October of 2010, after an MRI of the cervical spine [AR 214], and Plaintiff's gastritis first appeared on the medical record in July of 2010. [AR 236]

Second, the ALJ used Dr. Sexton's access to Plaintiff's medical history as a factor in giving greater weight to that opinion. [AR 18] Defendant argues Dr. Sexton had better access to review the medical records as a whole, dating back to 2010 at VWHS. *See* Defendant's Response Brief, docket #20 at 16. Plaintiff argues that Dr. Sexton's opinion was based only on Plaintiff's consultation with Dr. Madsen and is therefore less extensive than that of the treating physician. *See* Plaintiff's Opening Brief, docket #17 at 30.

As discussed *supra*, an ALJ may properly assign less weight to a treating physician's assessment of a claimant in cases where the treatment relationship was relatively brief, the treatment was not supported by the record or other evidence, or the treating physician was not a specialist in the area being treated. Dr. Satt treated Plaintiff for approximately six months before she returned to VWHS. [AR 254, 312] Dr. Satt completed the RFC in March, three months after he began treating Plaintiff. [AR 287-94] He designated Plaintiff permanently disabled, however permanent disability is an administrative designation reserved to the Commissioner. [AR 18] Dr. Sexton, on the other hand, reviewed medical records dating back to 2010. While Dr. Sexton did not treat the patient, she is a specialist in psychology, whereas

Dr. Satt has no reported mental health credentials. Therefore, the ALJ did not err when he considered Dr. Sexton's ability to review Plaintiff's medical records more appropriate than Dr. Satt, who treated the patient for six months and is not a psychology specialist.

Third, the ALJ attributed Dr. Sexton's expertise in providing medical opinions to be a factor in assigning "great weight" to her opinion. [AR 18] Plaintiff argues that Dr. Sexton's qualifications and expertise are not apparent from the record. *See* Plaintiff's Opening Brief, docket #17 at 31. Defendant argues that according to Social Security regulations, 20 C.F.R. § 404.1527(c)(5), medical consultants such as Dr. Sexton are highly qualified and are experts in Social Security disability evaluations. *See* Defendant's Response Brief, docket #20 at 16. Dr. Sexton is an expert in psychology and is therefore considered a specialist. *Id.*

The Court finds that the ALJ did not err in assigning greater weight to a physician with a mental health specialty. Dr. Satt is a family physician who treated Plaintiff for both mental and physical ailments. While a family physician does not need to be a specialist to assess a patient's mental capabilities, the ALJ may give the opinion of a mental health specialist such as Dr. Sexton greater weight. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") Dr. Satt has not provided any information as to his credentials for mental health treatment. [AR 19] While Dr. Sexton's credentials are also not reflected in the record, the ALJ may properly give greater deference to a doctor opining within her specialty.

For the foregoing reasons, the Court finds that the ALJ did not err in elevating the

opinion of the State psychologist examiner over the treating physician.

## IV.   Whether the ALJ's Assessment Failed to Account for all of Dr. Sexton's Opined Limitations

Plaintiff argues that the ALJ assigned Dr. Sexton's opinion "great weight" but failed to account for all of the limitations without a proper explanation.   *See* Plaintiff's Opening Brief, docket #17 at 32-34.   Plaintiff specifically argues that the ALJ did not account for Plaintiff's limitations in interacting with supervisors and coworkers.   *Id.*   Defendant counters that the ALJ did incorporate the limitations of coworker and supervisory interaction because low stress work generally includes less interaction with others.   *See* Defendant's Response Brief, docket #20 at 18.   Further, Defendant argues that Plaintiff failed to explain how the two occupations, security monitor or machine tender, are inconsistent with Dr. Sexton's opinion.   *Id.*

At Step Five of the sequential process, an ALJ bears the burden "to show that there are jobs in the regional or national economies that the claimant can perform with the limitations the ALJ has found [the claimant] to have."   *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999).   Specifically,

> the ALJ must find that the claimant retains particular exertional [and non-exertional] capacit[ies], decide whether the claimant has acquired transferable skills, identify specific jobs that the claimant can perform with the restrictions the ALJ has found the claimant to have, and verify that the jobs the claimant can do exist in significant numbers in the regional or national economies.   All of these findings must be supported by substantial evidence.

*Id.* at 1088-89; *see also Hackett v. Barnhart*, 395 F.3d 1168, 1175 (10th Cir. 2005). "Determining 'the functional demands and job duties' of specific jobs and matching those requirements to a claimant's limitations is the very task the ALJ must undertake at step five."

*Haddock*, 196 F.3d at 1090.   Accordingly, an ALJ may rely on the testimony of a VE and/or reliable publications, such as the Dictionary of Occupational Titles ("DOT").   *Id.* "Questioning a vocational expert about the source of his opinion and any deviations from a publication recognized as authoritative by the agency's own regulations falls within the ALJ's duty to develop the record."   *Id.* at 1091.

In this case, the ALJ, through the testimony of the VE, highlighted two jobs that exist in the national economy for an individual with the claimant's age, education, work experience, and RFC.   [AR 19]   The ALJ asked the VE during Plaintiff's hearing about jobs in the DOT with the following restrictions: (1) she can only perform low stress work; (2) she cannot perform a job that exposes her to pulmonary irritants; (3) she cannot be exposed to humidity or temperature extremes; and (4) she cannot perform any job that requires her to move her neck repetitively. [AR 38]   The ALJ clarified low stress work as worth that: limits interaction with the public; has simple, routine job tasks; does not expose the worker to danger; and does not have high production demands or piece-rate pay.   *Id.*

The Court finds the ALJ did not err by asking the VE about low stress work instead of the specific restrictions outlined in Dr. Sexton's RFC.   Dr. Sexton wrote that Plaintiff "can accept supervision and interact w/co-workers as long as contact is not frequent or prolonged."   [AR 56]   In the definition of low stress work, the ALJ limited the Plaintiff's interaction with the public.   Generally, low stress jobs with simple, routine tasks have less interaction with the public, co-workers and supervisors.   The Court rejects the Plaintiff's argument that the ALJ picked and chose portions of Dr. Sexton's opinion, as the ALJ created an RFC that includes

Plaintiff's limitations.

## **CONCLUSION**

In sum, the Court concludes that the ALJ properly determined Plaintiff's impairments for disability.   The ALJ appropriately performed the two-step analysis, included Plaintiff's impairments in his assessment of the RFC, weighed the medical opinions, and accounted for limited interaction with supervisors and co-workers.   The Court finds the disability decision is supported by substantial evidence in the record as a whole.

Therefore, the decision of the ALJ that Plaintiff Tina Lane is not disabled is **affirmed**.

Dated at Denver, Colorado this 15th day of July, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge